**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| QUINLAN MALLOY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:23-cv-02234 |
| | ) | |
| v. | ) | Judge Georgia N. Alexakis |
| | ) | Magistrate Judge Jeffrey T. Gilbert |
| CHICAGO POLICE OFFICERS DANIEL | ) | |
| MORRIN (#5605), SUPERINTENDENT | ) | |
| DAVID BROWN, and CITY OF CHICAGO, | ) | JURY DEMAND |
| | ) | |
| Defendants. | ) | |
| | ) | |

## SECOND AMENDED COMPLAINT

1. During the summer of 2020, thousands of people, including Plaintiff Quinlan Malloy, took part in protests throughout the City of Chicago opposing police brutality and racism.

2. The Chicago Police Department ("CPD") responded to these demonstrations with brutal, violent, and unconstitutional tactics that were clearly intended to injure, silence, and intimidate Plaintiff, other protesters, protest leaders, legal observers, and medics. These abusive tactics included beating protesters with batons—often striking them in the head; tackling and beating protesters while on the ground; using chemical agents against protesters; falsely arresting protesters; and trapping protesters in enclosed areas.

3. CPD officers' animus against Plaintiff and other protesters is unmistakable—they regularly called protesters vile and vulgar names, often using misogynistic and homophobic words. Officers were also aggressive, rude, disrespectful, and often affirmatively escalated encounters through taunts, shoves, pushes, and other inappropriate behavior at these protests.

1

4.     CPD's response to the summer 2020 protests was consistent with the CPD's long-standing policies and practices of using abusive tactics and excessive force against protesters seeking progressive social and political change.

5.     These systemic and ongoing violations continued to occur despite the City of Chicago being subject to a Consent Decree.  CPD's documented failure to comply with the Consent Decree deadlines coupled with its consistently illegal and violent response to the summer 2020 protests demonstrate that the Consent Decree has entirely failed to create any meaningful change in the CPD.

6.     CPD's unconstitutional policies and practices against protesters has caused Plaintiff significant harm, including the violation of his constitutional rights as well as physical, emotional, and mental injuries.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a).  This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over claims arising under Illinois state law.

8.     Venue is proper in this district under 28 U.S.C. § 1391(b) because the events giving rise to the claims asserted in this complaint occurred in this judicial district.

## PARTIES

9.     Plaintiff Quinlan Malloy is a 32-year-old[1] white resident of Streamwood, Illinois who uses he/him pronouns.  Plaintiff Malloy attended a protest in downtown Chicago on May 30, 2020.

---

[1]  Plaintiff's age listed here is his age at the time the original complaint was filed on November 19, 2020.

10.     Defendant City of Chicago is and at all times mentioned herein was a municipality organized and operating under the statutes of the State of Illinois.  It is authorized under the statutes of the State of Illinois to maintain the Chicago Police Department, which acts as the City's agent in the areas of municipal law enforcement, and for which the City is ultimately responsible.  Defendant City was, at all times material to this Complaint, the employer and principal of the Defendant Officers.

11.     Defendant David Brown was the Superintendent of the Chicago Police Department.  At all times relevant to the events at issue in this case, Defendant Brown was employed by the CPD.  As such, he was acting under color of law.  At all times relevant to the events at issue in this case, Defendant Brown promulgated rules, regulations, policies, and procedures of the CPD.  Defendant Brown was responsible for supervising all CPD officers and managing all operations at the CPD.  He is sued here in his individual capacity.

12.     Defendant Officer Daniel Morrin (#5605) is a City of Chicago employee with the CPD.  At all times relevant to the events at issue in this case, this defendant was acting under color of law and within the scope of his employment with the CPD.  He is sued in his individual capacity for violating Plaintiff's rights guaranteed by the U.S. Constitution and Illinois state law.

## FACTUAL ALLEGATIONS

### I.     The CPD's Violent and Unconstitutional Response to Protesters Throughout the Summer of 2020

13.     On May 25, 2020, Minneapolis police officers murdered George Floyd when they suffocated him to death while he was handcuffed in a prone position on the ground in broad daylight on the street.

14.     Floyd's murder and the police murder of Breonna Taylor in her home in Louisville, Kentucky, in addition to recent police murders of too many additional Black people

throughout the United States, sparked the largest social justice movement in the history of the United States and has included protests around the world against anti-Black police violence, white supremacy, systemic racism, and inequality.

15.     From May to August 2020, there were numerous protests and actions throughout the City of Chicago—ranging in size from a few dozen people to thousands.  These protests occurred all throughout Chicago, including in the Loop and on the South, West, and North sides, and were attended by people of all ages, races, and demographics.  In particular, protests occurred on May 29–31, June 1, July 17, and August 15, 2020.

16.     CPD responded to these protests with brutal, violent, and unconstitutional tactics that were clearly intended to injure and silence protesters who were protesting their violence and the violence of other state actors.

17.     CPD officers consistently targeted protesters who were peacefully exercising their First Amendment rights with unlawful, retaliatory, and lethal force.

18.     Protesters often reported that CPD officers intentionally struck them on their head with batons with enough force to leave people bloodied and in some instances with serious concussions.

19.     On June 23, 2020, the Chicago Reader published an in-depth examination of the CPD's use of lethal force, including baton strikes to the head, during the May 2020 protests (excluding protests in June, July, and August).  The reporter documented:

> 83 baton strikes on at least 32 different people by officers, most captured on video. Nearly all appear to violate [CPD] policy, with more than half of the strikes on video involving police beating people who were already on the ground.  Multiple videos also show officers hitting protesters in the head with batons despite rules limiting these strikes to situations requiring deadly force.

4

20.     The Chicago Reader article notes that these unlawful uses of force often occurred in full view of supervisors who failed to intervene and that most officers failed to report their uses of force.

21.     CPD's brutal response to these protests and protesters also included police officers:

      a.  driving CPD cars through crowds of protestors;

      b.  punching protesters in the face;

      c.  tackling protesters to the ground;

      d.  kneeing protesters in the neck and back;

      e.  kicking protesters in the legs to cause them to fall;

      f.  jabbing batons into protesters' bodies;

      g.  trapping protesters on bridges, pushing protesters stranded on bridges, pinning protesters against hard surfaces on bridges and other locations;

      h.  using tear gas and pepper spray;

      i.  dragging protesters through the streets;

      j.  stomping on protesters on the ground; and

      k.  beating protesters severely with batons.

These acts of violence were wholly unwarranted and there was no objectively reasonable basis to use such dangerous and violent force.

22.     CPD officers also targeted those who were filming, or otherwise documenting police violence at the protests, by pushing, shoving, brutalizing, and harassing them in the midst of the protests.  Often this resulted in confiscated or damaged cameras and recording equipment and physical injury to protesters exercising their First Amendment right to record the police.

23.     CPD officers who violated protesters' constitutional rights also routinely took steps to conceal their identities—and thereby avoid accountability for their misconduct—by, *inter alia*, covering and/or removing their name plates and badges, refusing to provide their

names and badge numbers when asked, obstructing protesters who attempted to view their name plates and badges, and failing to complete paperwork to document their conduct.

24.     CPD officers were also aggressive, rude, disrespectful, and often affirmatively escalated encounters through taunts, shoves, pushes and other inappropriate behavior at these protests.  CPD officers used particularly hostile language towards women and members of the LGBTQ community.

25.     CPD officers' animus against protesters is unmistakable—they regularly referred to protesters with terms that are vile, misogynistic, and anti-gay, including officers calling protesters "pussy," "cunt," "bitch," and "faggots," and repeatedly use the word "fuck" when issuing commands.  One officer threatened protesters by yelling "you fucking bitch," and "wait till I get my badge off, you fucking faggot."

26.     CPD's response to the protests also reflects a pattern and practice of breaking, stealing, or otherwise disposing of protesters' belongings, including bikes, cameras, phones, glasses, goggles, backpacks, and, in some instances, canes used to assist with mobility.

27.     CPD also engaged in a systemic practice of illegal searches of protesters, seizure of protesters, and false arrest of protesters.

28.     Despite widespread evidence of unchecked police violence, throughout these events, former Mayor Lori Lightfoot praised the police for their "restraint."

29.     As of February 2021, protesters filed 591 protest-related complaints against CPD officers.  58% of those complaints alleged excessive force and 9% alleged verbal abuse. The number of protest complaints is so large, the Civilian Office of Police Accountability ("COPA") formed a specialized team of investigators solely dedicated to investigating these allegations. As a result of COPA's preliminary investigations into the protest complaints, it referred 5 officers to

state/federal law enforcement for potential criminal prosecution and has recommended that 8 officers be assigned to modified duty and/or be relieved of police power. No other officers involved in protest-related abuses have been disciplined thus far.

30. During a City Council budget hearing, COPA's Chief Administrator, Sydney Roberts, informed City lawmakers that "several themes were prevalent" throughout the protest complaints including "excessive use of batons," "excessive verbal abuse" and the failure of officers to comply with CPD's body camera policy as well as policies requiring Chicago police officers to display their names and badge numbers. Chief Roberts also noted that these themes were so "consistent across multiple investigations" that she sent a memo to CPD leadership urging it to "take immediate action to address the deficiencies." Upon information and belief, Defendant Superintendent Brown received Chief Robert's memo during the Summer 2020 uprisings and failed to take any action to redress the documented deficiencies.

31. Pursuant to the relevant Chicago code provisions, Defendant Superintendent Brown is "responsible for the general management and control of the Police Department" and has "full and complete authority to administer the Department." Defendant Superintendent Brown made all command decisions about the Chicago Police Department's systematic response to protesters during the 2020 uprisings. Defendant Superintendent Brown, through actions both explicit and implicit, authorized and directed the unlawful conduct described throughout this complaint. He encouraged and permitted Chicago police officers to target, attack, and harass protesters with violent animus and took no action to halt Chicago police officer's systemic violence against protesters for Black lives.

32. On May 30, 2020—the first weekend of the protests—Defendant Superintendent Brown watched the events unfold over live video feed at the Office of Emergency Management

and Communications ("OEMC") control center, also referred to as the Emergency Operations Center ("EOC"). Defendant Superintendent Brown was in charge in the EOC.

33. From the EOC, Defendant Superintendent Brown provided, at various times throughout the day on May 30, 2020, permission to command staff in the field to deploy OC spray on crowds of protesters. He assessed the need for OC spray through radio communications and camera footage of events on the ground. He continued to authorize the use of OC spray on May 31, 2020.

34. Defendant Superintendent Brown was involved in the decision to declare a mass arrest situation on May 30, 2020, which lead to protesters being falsely arrested.

35. Defendant Superintendent Brown was also involved in the decision to raise the bridges on May 30, 2020, which made it difficult for protesters, including Plaintiff Malloy, to leave downtown and go home.

36. Further, Defendant Superintendent Brown was physically present on the ground for at least one protest on August 15, 2020, where he described standing "shoulder to shoulder" with Chicago police officers. During the protest(s) Defendant Superintendent Brown attended personally, he failed to intervene to stop officer violence and misconduct.

37. In an apparent effort to justify and/or conceal his officers' brutal violence and unlawful conduct, Defendant Superintendent Brown made a number of false and misleading statements to the media about the Summer 2020 uprisings and the actions of Chicago police officers. For example, in reference to the August 15, 2020 downtown protest, Defendant Superintendent Brown stated that he and his officers "trailed along" the protesters until the protesters became "confrontational" and began assaulting officers. Defendant Superintendent Brown asserted that his officers did not engage in the practice of kettling (i.e., detaining a mass

of people without justification and failing to provide people opportunities to leave). After an investigation, a media outlet labeled these assertions as "false" and found evidence of kettling and video depicting Chicago police officers chasing demonstrators and witnesses who described Chicago police officers attacking protesters who did not immediately disperse. The same outlet also declared that Defendant Superintendent Brown publicly expressed a number of misleading and unsubstantiated negative statements about protesters including that they carry mace and were "agitators [who] hijacked a peaceful protest."

38.     On October 13, 2020, Defendant Superintendent Brown acknowledged serious ongoing and systemic deficiencies within the CPD during his address to new CPD recruits. Defendant Superintendent Brown informed the recruits that "this civil unrest is about you." He informed them that they would be working alongside officers who "never should have been hired" and "who have lost their way" and that, despite the existence of these officers, the new recruits must "discern" right from wrong. During the same address, Defendant Superintendent Brown also acknowledged that "good cops don't tell on the bad cops" and that CPD has a culture of "protecting each other" and that it is difficult for officers to "hold each other accountable."

**II.     May 30, 2020 Attacks of Plaintiff Quinlan Malloy (Downtown)**

39.     Plaintiff Malloy broke his back in September 2016 and has since recovered, but doctors informed him that aggravating this pre-existing spinal injury, or suffering a new spinal injury, could force him to rely on a wheelchair. This is, in part, due to a degenerative disc disease.

40.     On May 30, 2020, Plaintiff Malloy took a train into the City of Chicago and arrived at Union Station around 11:30 a.m. to participate in a protest in support of the Black Lives Matter movement and against racist police violence.

41.     Plaintiff Malloy listened to speakers at Federal Plaza and then started marching around 2:00 p.m. At some point the march got split up, and the police prevented the two groups from joining up again.

42.     Around 3:45 p.m., Plaintiff Malloy was in the front line of one of the groups of protesters when activists asked everyone to link arms.  While their arms were linked, a protester tripped, which caused the entire link of protesters to lurch forward slightly.  Chicago police officers then started beating protesters with batons.

43.     An unidentified Chicago police officer hit Plaintiff Malloy in the left leg with a baton without justification.  The officer then punched Plaintiff Malloy in the chest and grabbed him by the shirt.  Plaintiff Malloy put his hands up and told the officer, "I didn't touch you, let me go."  The officer eventually let him go.

44.     Plaintiff Malloy and the crowd of protesters resumed marching downtown.

45.     By around 7:45 p.m., the bridges were raised and many streets were blocked off, which caused lots of confusion among protesters on where to go and how to get home.  Plaintiff Malloy joined a crowd of protesters walking south.  As Plaintiff Malloy was walking, Chicago police officers grabbed him and other protesters and shoved them towards moving cars while telling them to keep walking.

46.     Around 8:30 p.m., as Plaintiff Malloy was walking back to Union Station, he observed a Chicago police officer threatening a young Black woman.  He was recording video on his phone and captured the interaction.  Upon observing Plaintiff Malloy recording with his phone, Defendant Officer Daniel Morrin (#5605) came up from behind without warning and pulled Plaintiff Malloy's backpack handle, snapping Plaintiff Malloy backward.  Defendant Officer Morrin then shoved Plaintiff Malloy forward.

47.     When Plaintiff Malloy attempted to view Defendant Officer Morrin's badge number, Sergeant Anthony Richardson stood in front of Defendant Officer Morrin to purposefully block Plaintiff Malloy from seeing Defendant Officer Morrin's badge.  Plaintiff Malloy explained to Sergeant Richardson that he had a right to know the officer's badge number.

48.     Eventually, Defendant Officer Morrin emerged from behind Sergeant Richardson, and Plaintiff Malloy was able to identify his name and badge number.

49.     Directly after this interaction, Plaintiff Malloy's adrenaline wore off and he collapsed from the back pain caused when Defendant Morrin aggressively jerked him backwards and shoved him forward.  The pain was so severe because Defendant Officer Morrin aggravated Plaintiff Malloy's pre-existing spinal injury.

50.     As Plaintiff Malloy could not walk, protesters had to carry him out of the crowd. They then found a medic on the street who fashioned a make-shift brace to stabilize Plaintiff Malloy's back.  As the trains were closed, and therefore there was no way for Plaintiff Malloy to get home, protesters helped to arrange a ride home for Plaintiff Malloy.

51.     Plaintiff Malloy now relies on a wheelchair and a mobility-assistance trained service dog when he engages in activities that require him to stand or walk for a significant length of time.  He is in constant pain that does not subside.  As a result, he has limited his activities outside his home, including limiting the number of clients he sees as part of his business.

52.     Plaintiff Malloy did not physically attack, assault, threaten, or resist Defendant Officer Morrin or any other police officer at any time or in any way.  Plaintiff Malloy did not disobey any instruction from Defendant Officer Morrin.  Defendant Morin gave no warning or instruction to Plaintiff Malloy before violently snapping him backward.

53.     Plaintiff Malloy did not commit any unlawful act and was engaging in constitutionally protected activity.

54.     At the time the officers used excessive force against Plaintiff Malloy, the officers knew that Plaintiff Malloy was participating in a public demonstration, and, based on that participation, the officers acted in a punitive and retaliatory manner toward Plaintiff Malloy.

55.     As a direct and proximate result of the actions of the Defendant Officers as detailed above, Plaintiff Malloy suffered and continues to suffer, *inter alia,* bodily injuries, including back pain and bruises, as well as pain and suffering, extreme mental distress, anguish, and fear.

**III.    CPD's Policy and Practice Failures: Using Force Against Protesters, Unreasonable Force When No Force Is Required, and Failure to Discipline/Code of Silence**

56.     The City's long standing policies, practices, and customs for shutting down protests are the direct and proximate cause of the constitutional violations outlined in this Complaint.

**A.    CPD's Policy and Practice of Using Unreasonable Force, Violence, and False Arrests to Quell Protest**

57.      CPD's actions during the summer of 2020 were far from isolated incidents.  The violations of Plaintiff Malloy's constitutional rights were the result of the CPD's longstanding policies and practices of attempting to quell protest through unconstitutional tactics against protesters including excessive force, violence, and false arrests.

58.     CPD has demonstrated a widespread practice of inflicting unconstitutional violence on people exercising their right to assemble and protest, along with unlawfully depriving people of their freedom in retaliation for their protest activities.  CPD deployed violent and unconstitutional tactics in response to anti-war protests and protests relating to the AIDS

epidemic in the 1990s, protests during the 1996 Democratic National Convention, an anti-war protest in 2003, an anti-deportation protest in 2011, and a protest against Donald Trump in 2016.

### B.    CPD's Widespread Practice of Excessive Force

59.    CPD's violence and brutality against protesters is consistent with the Department's widespread policy and practice of using aggressive tactics that unnecessarily escalate encounters with individuals, increase tensions, and lead to excessive force.  This widespread practice of violence has been documented and acknowledged by the U.S. Department of Justice ("DOJ"), the Chicago Police Accountability Task Force (the "Task Force"), the federal courts, civil rights activists, City officials—including the Mayor and Superintendent of Police—and, above all, by the Black communities most targeted by CPD for violence and abuse.

60.    In April 2016, the Task Force released a report about the system of training, accountability, and oversight of CPD officers (the "Task Force Report").  It found "substantial evidence" of racially disproportionate force against people of color, particularly African-Americans.

61.    In 2015, the Department of Justice, Civil Rights Division, Special Litigation Section, and the U.S. Attorney's Office for the Northern District of Illinois jointly initiated an investigation of the CPD and the accountability body charged with overseeing the police.  The DOJ investigation assessed the CPD's use of force, and addressed CPD policies, training, reporting, investigation, and review related to officer use of force.

62.    In January 2017, the DOJ finished its investigation and released its findings (the "DOJ Findings Report").  The DOJ Findings Report concluded that "CPD officers engage in a pattern or practice of using force that is unjustified, disproportionate, and otherwise excessive . . . CPD officers use unnecessary and unreasonable force in violation of the Constitution with

frequency, and that unconstitutional force has been historically tolerated by CPD." The DOJ Report also found that the CPD relied on overly aggressive, escalatory, and retaliatory tactics.

### C. CPD Has Wholly Disregarded Consent Decree Requirements

63.     As a result of litigation, the City eventually agreed to a Consent Decree that mandates police reform. The federal court approved the Consent Decree on January 19, 2019.

64.     An Independent Monitoring Team ("IMT"), assesses the City and CPD's compliance with the Consent Decree in biannual reports. The first two IMT reports make clear that the City and CPD have failed to comply with the reform schedule.

65.     In its First Report filed on November 15, 2019, the IMT found, among other things, that CPD did not achieve secondary or full compliance in any paragraphs concerning use of force. In the Second IMT Report, filed June 18, 2020, the CPD continued its pattern of systematic non-compliance with the assessed paragraphs of the Consent Decree.

66.     The City's non-compliance and missed deadlines bear directly on CPD's civil rights abuses at the recent protests. The Consent Decree contains a number of provisions that, if meaningfully implemented by the CPD prior to the Summer 2020 uprisings, were intended to prevent the injuries detailed in this Complaint. These provisions concern baton strikes, medical aid, use of force, recording police officers, and derogatory language.

### D. CPD's Widespread Code of Silence and Failure to Discipline Abusive Officers

67.     CPD has maintained its widespread practice of excessive force through promoting the "code of silence" and the failure to discipline Chicago police officers trained and required to lie or remain silent about police misconduct, including the use of excessive force and discriminatory policing. Any officer who violates this code is penalized by the CPD.

68.     CPD's code of silence has been documented and acknowledged by government

reports, including the Task Force Report and the DOJ Report, by City officials, including the Mayor and Superintendent of Police, and by federal courts.

69.     CPD's failure to discipline Chicago police officers who engage in misconduct is evidenced by the findings of the Citizens Police Data Project and the DOJ Report.

70.     CPD's policy, practice, and custom of failing to discipline, supervise, monitor, and control its officers, including the Defendant Officers, allows its officers to believe they can abuse and violate the rights of individuals without consequence.

71.     While a number of Consent Decree provisions aim to eliminate the code of silence, CPD has failed to comply with these terms.  For example, the IMT reports overarching concerns about the entire complaint process, including CPD's failure to support an adequate anonymous complaint process, and its failure to ensure that officers who report misconduct receive protection.

> **E.    Governmental Reports and an Investigation by the Federal Consent Decree Monitor Document CPD's Widespread Policy and Practice Violations During the 2020 Protests**

72.     In February 2021, the CPD released a 26-page report: *After Action Report: The Chicago Police Department's Response to Civil Unrest between May 29, 2020 and June 12, 2020*.  In this report, CPD makes a number of key admissions about its failed response to the 2020 uprisings, including lack of preparation, lack of training, lack of compliance with policies regarding mass arrests, and removal of names and badges from officers' uniforms.

73.     CPD's After Action report is also important for what it omits.  For example, it failed to note CPD officer's well documented policy violations relating to batons and other uses of force.  The report also fails to mention the physical and emotional trauma protesters described during federal court proceedings—yet it described in some detail the harm suffered by the

business community.  And it is silent about any concrete action CPD plans to take to protect

protesters from further harm at the hands of CPD officers.

74.     Also in February 2021, the Office of the Inspector General for the City of

Chicago ("OIG") released a Report on Chicago's Response to George Floyd Protests and

Unrest.  The OIG's report concluded that CPD failed to train officers regarding mass arrests and

failed to provide guidance regarding reporting obligations; Superintendent Brown authorized

use of OC spray in situations involving large crowds acting as non-compliant groups; officers

used OC spray on peaceful protesters; officer's use of force was not reviewed; and there were

widespread policy violations during the protests, including the use of baton strikes and other

force, the use of derogatory language, and attempts by officers to hide their identities.

75.     In July 2021, the IMT for the Consent Decree issued a 464-page report that

addresses the City's and CPD's "response to protest and unrest under the consent decree."  The

IMT's report similarly concluded that officers engaged in various levels of misconduct,

including excessive force and verbal abuse; CPD lacked policies and trainings to respond to the

protests effectively; officers were deployed without body-worn cameras and were instructed not

to have the cameras on during the protests; and available body-worn camera footage depicted

officers violating the law and CPD policies.

## LEGAL CLAIMS

### COUNT I – 42 U.S.C. § 1983
### Violation of the Fourth Amendment – Excessive Force

76.     Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth

herein.

77.     Count I is alleged against Defendant Officer Daniel Morrin.

78.     As described in detail above, the Defendant Morrin used unreasonable and excessive force, without legal cause, against Plaintiff, in violation of Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution.

79.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiff's clearly established constitutional rights.

80.     The actions of Defendant Morrin were the direct and proximate cause of the violations of Plaintiff's constitutional rights, bodily injury, pain, suffering, extreme mental distress, anguish, humiliation, and fear as set forth more fully above.

**COUNT II – 42 U.S.C. § 1983**
**Violation of the First Amendment – Freedom of Speech and Assembly, Intimidation and Retaliatory Use of Force**

81.     Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

82.     Count II is alleged against Defendant Officer Daniel Morrin.

83.     As described in detail above, Plaintiff was participating in lawful, constitutionally protected activity on the public streets of the City of Chicago.

84.     The actions of Defendant Morrin described above violated Plaintiff's rights to freedom of speech and assembly guaranteed by the First and Fourteenth Amendments to the United States Constitution, in that Plaintiff was abruptly prevented from further exercising his rights and suffered retaliation for having exercised his rights.

85.     Defendant Morrin retaliated against Plaintiff for engaging in protected speech by subjecting him to excessive force without legal justification.  Plaintiff's protected speech was the substantial and motivating factor for Defendant Morrin's use of force against him.  Defendant

17

Morrin's actions were intended to make Plaintiff and other people engaging in constitutionally-protected speech and assembly at the protests wary of continuing to engage in such protected activities in the future and specifically to chill their rights guaranteed under the First Amendment.

86.     At all relevant times, Defendant Morrin was aware that Plaintiff was engaged in constitutionally-protected speech and assembly when he violated Plaintiff's rights.  The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiff's clearly established constitutional rights.

87.     The actions of Defendant Morrin were the direct and proximate cause of the violations of Plaintiff's constitutional rights, bodily injury, pain and suffering, humiliation, extreme mental distress, anguish, and fear as set forth more fully above.

### COUNT III – 42 U.S.C. § 1983
### Failure to Intervene

88.     Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

89.     Count III is alleged against Defendant Superintendent David Brown in his individual capacity.

90.     During the events described above, Defendant Brown stood by without intervening to prevent the violation of Plaintiff's constitutional rights under the First, Fourth, and Fourteenth Amendments, even though he had the opportunity and duty to do so.

91.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiff's clearly established constitutional rights.

92.     As a direct and proximate result of Defendant Brown's failure to intervene, Plaintiff suffered damages, including bodily injury, pain and suffering, humiliation, extreme mental distress, anguish, and fear, as set forth more fully above.

**COUNT IV – 42 U.S.C. § 1983**
**Unlawful Policy and Practice**

93.      Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

94.     Count IV is alleged against Defendant City of Chicago.

95.     Defendant Morrin acted under the color of law, and under the authority of one or more interrelated de facto policies, practices, and/or customs of the Chicago Police Department, to violate Plaintiff's rights as set for in the preceding claims.

96.     The City of Chicago through its Police Department, Police Superintendent, Police Board, Mayor, and City Council has interrelated *de facto* policies, practices, and customs which included, *inter alia*:

> a.   Using excessive force against protesters without justification, including but not limited to: beating individuals with batons; beating protesters through punching, kicking, kneeing, and stomping; using chemical agents like pepper spray and tear gas; tackling protesters to the ground; and hitting individuals with bikes.
>
> b.   Using lethal force against protesters, including but not limited to striking protesters on the head and neck with batons.
>
> c.   Retaliating against protesters who record the police and/or speak out against police violence.

d.  Escalating encounters through taunts, slurs, pushes, shoves, and acts that illustrate CPD's animus toward protesters.

e.  Falsely arresting protesters for engaging in protected speech and assembly.

f.  Targeting those the CPD has identified as, or perceives to be, leaders, protest marshals, legal observers, and medics for excessive force and false arrest.

g.  Giving protesters no reasonable opportunity to leave and/or trapping protesters in enclosed areas.

h.  Using chemical agents like pepper spray and/or tear gas without prior warning.

i.  Breaking, stealing, or otherwise disposing of protesters' belongings, including bikes, cameras, phones, glasses, goggles, and backpacks.

j.  Failing to intervene to prevent police violence and other forms of misconduct.

k.  Failing to hold officers accountable who violate protesters' rights.

l.  Failing to train officers on how to appropriately respond to protesters.

m.  Maintaining, condoning, and failing to take any steps to end the code of silence in the CPD that allows Chicago police officers to violate protesters and other civilians' rights with impunity.

n.  Maintaining, condoning and failing to take appropriate steps to prevent the abuse of civilians by unidentified officers;

o. Failing to put in place appropriate policies and practices to require police officers to identify themselves when making physical contact with the public;

p. Failing to identify police officers who are accused of misconduct so that their conduct may be appropriately investigated and officers disciplined if necessary;

q. Failing to adequately supervise police officers so that they are not allowed to commit misconduct under the cloak of anonymity.

97.    The interrelated policies, practices, and customs alleged above are or should be well-known within the CPD.

98.    The CPD is aware of the harms suffered by Plaintiff and other protesters as a result of the interrelated policies, practices, and customs alleged above.

99.    The City has implemented, enforced, encouraged, and sanctioned CPD's policies, practices, and customs alleged above in violation of Plaintiff's and other protesters' First, Fourth, and Fourteenth Amendment rights.

100.    The City has acted with deliberate indifference to the First, Fourth, and Fourteenth Amendment rights of Plaintiff.  As a direct and proximate result of the acts and omissions of the City and CPD, the First, Fourth, and Fourteenth Amendment rights of Plaintiff have been violated.

101.    Defendant Superintendent Brown, in his role as Superintendent of the CPD, was the final policymaker for CPD's response to the protests.

102.    Defendant Superintendent Brown developed and maintained policies, practices, procedures, and customs of Chicago Police officers using excessive force against protesters and

falsely arresting protesters, exhibiting deliberate indifference to the constitutional rights of Plaintiff, including but not limited to those policies, practices, procedures, and customs described above, which caused the violation of Plaintiff's rights as described herein and the resultant damages suffered.

103.     Defendant Superintendent Brown had the power to prevent or aid in the prevention of the wrongs done and conspired to be done as described herein, yet failed or refused to do so, in violation of 42 U.S.C. § 1983.

104.     Upon information and belief, Defendant Superintendent Brown was deliberately indifferent to the need for further training, supervision, or discipline related to the use of force against protesters, as reflected by the continued maintenance of the policies, practices, and customs of using excessive force that was carried out by Chicago Police officers under his control.

105.     The actions and omissions of Defendant Superintendent Brown as described herein were done with knowing disregard for the constitutional rights of Plaintiff.  Defendant Superintendent Brown acted maliciously, willfully, wantonly, and in reckless disregard of Plaintiff's rights under the Constitution.

106.     The policies, practices, procedures, and customs of the CPD were the direct and proximate cause of the violations of Plaintiff's constitutional rights and the damages he suffered, including bodily injury, pain and suffering, humiliation, extreme mental distress, anguish, and fear as set forth more fully above.

### COUNT V – Illinois State Law Claim
### Violations of the Illinois Constitution

107.     Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

22

108.     Count VI is alleged against Defendant Officer Daniel Morrin.

109.     The actions taken by Defendant Morrin denied Plaintiff his state constitutional rights to free expression and assembly in a peaceable manner; as provided by the Illinois Constitution, Article I, sections 1, 2, 4, 5, and 6, and were a direct and proximate cause of Plaintiff's injuries as set forth above.

110.     The actions of Defendant Morrin were the direct and proximate cause of the violations of Plaintiff's Illinois State Constitutional Rights.

### COUNT VI – Illinois State Law Claim
### Assault and Battery

111.     Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

112.     Count VI is alleged against Defendant Officer Daniel Morrin.

113.     As described in detail above, Defendant Officer Morrin physically abused Plaintiff by, *inter alia*, yanking on his backpack and shoving him, all without justification.

114.     The actions of Defendant Morrin were affirmative acts and threatened to cause or did cause an unpermitted contact of a harmful and/or offensive nature, to which Plaintiff did not consent, and thus constitute assault and battery under laws of the State of Illinois.

115.      The actions of Defendant Morrin were committed in a willful and wanton manner.

116.     Defendant Morrin's actions directly and proximately caused injury and damage as set forth above.

### COUNT VII – State Law Claim
### Respondeat Superior

117.    Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

118.    Count VII is alleged against Defendant City of Chicago.

119.    In committing the acts alleged in this Complaint, Defendant Morrin was a member and agent of the CPD, acting at all relevant times within the scope of his employment.

120.    Defendant City of Chicago is liable as principal for all torts in violation of state law committed by its agents.

<b>COUNT VIII – State Law Claim<br>Indemnification</b>

121.    Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

122.    Count VIII is alleged against Defendant City of Chicago.

123.    In Illinois, pursuant to 735 ILCS 10/9-102, public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

124.    Defendant Morrin acted within the scope of his employment in committing the misconduct described herein.  Therefore, Defendant City of Chicago is liable as his employer for any resulting damages or award of attorney's fees.

<b>REQUEST FOR RELIEF</b>

WHEREFORE, Plaintiff requests that this Court enter judgment in his favor against the Defendants in the following manner:

1.    Award Plaintiff compensatory and punitive damages.

2.    Award Plaintiff reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988.

3.      Award Plaintiff such other and further relief as this Court may deem appropriate

and just.

## JURY DEMAND

Plaintiff demands trial by jury.


Dated: March 18, 2025                         Respectfully submitted,

                                              /s/ Vanessa del Valle
                                              Vanessa del Valle
                                              Adam J. Smith
                                              Kaplan & Grady LLC
                                              2071 N. Southport Ave., Suite 205
                                              Chicago, IL 60614
                                              (312) 852-2184
                                              vanessa@kaplangrady.com
                                              adam@kaplangrady.com

                                              /s/ Sheila A. Bedi
                                              Sheila A. Bedi
                                              Community Justice and Civil Rights Clinic
                                              Northwestern Pritzker School of Law
                                              375 E. Chicago Ave.
                                              Chicago, IL 60611
                                              (312) 503-8576
                                              sheila.bedi@law.northwestern.edu

                                              /s/ Nora Snyder
                                              Nora Snyder
                                              Brad Thomson, Janine Hoft, Ben Elson,
                                              Jan Susler, Tayleece Paul
                                              People's Law Office
                                              1180 N. Milwaukee Ave.
                                              Chicago, IL 60642
                                              773-235-0070
                                              brad@peopleslawoffice.com
                                              janinehoft@peopleslawoffice.com
                                              ben@peopleslawoffice.com
                                              jsusler@peopleslawoffice.com
                                              norasnyder@peopleslawoffice.com
                                              tayleece@peopleslawoffice.com